**Glenda BRUNETTE, Plaintiff–Appellant,**

v.

**HUMANE SOCIETY OF VENTURA COUNTY, a non-profit corporation; The Ojai Publishing Company, Inc., d/b/a The Ojai Valley News, a corporation; Tim Dewar; Jolene Opinion Hoffman; Robert Jeffrey Hoffman; Shawna Boatman; Tim Cozatt, Defendants–Appellees.**

No. 00–56730.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 2002.

Filed June 28, 2002.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 23, 2002.

Henry H. Rossbacher (Argued), Rossbacher & Associates, Los Angeles, CA, for the plaintiff-appellant.

Nanci E. Nishimura (Briefed), Rossbacher & Associates, Los Angeles, CA, for the plaintiff-appellant.

Kelli L. Sager (Argued and Briefed), Davis Wright Tremaine LLP, Los Angeles, CA, for the defendants-appellees.

Before TROTT, THOMAS and WARDLAW, Circuit Judges.

## OPINION

TROTT, Circuit Judge.

Glenda Brunette ("Brunette") sued Tim Dewar ("Dewar") and the Ojai Valley News ("Ojai News") (collectively "the Media"), under 42 U.S.C. § 1983, for violating her Fourth Amendment rights during an illegal search of her property. The district court dismissed Brunette's claim because she did not allege facts sufficient to demonstrate that the Media was a state actor. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm the district court's decision. During the objectionable search of Brunette's ranch, the Media did not perform any government function or engage in any joint action with the Humane Society of Ventura County ("Humane Society"), which was executing the search warrant. The Media was not a state actor; it was simply a private spectator, photographing and videotaping the search independently and for its own purposes.[1]

---

1. In this opinion, we consider only Brunette's § 1983 claim against the Media for violation of her Fourth Amendment rights. In a sepa-rate, unpublished memorandum, we affirm, in part, reverse, in part, and remand, the

## BACKGROUND

Brunette, a 60–year old widow, operates a pedigreed cat breeding business on her eleven acre ranch and avocado farm in the unincorporated portion of Ojai, California. Brunette's property is rugged and hilly, bordered by Los Padres National Forest. Fencing surrounds the entire property. Entrance is possible only by traversing a frontage road and passing through a locked gate. A "No Trespass" sign further dissuades unexpected visitors. A paved driveway snaking up a steep hill from the frontage road leads to Brunette's modest three–bedroom home.

■ In June 1995, concerned citizens reported to the Humane Society that Brunette was "selling cats that looked sick, with eyes matted shut and covered in flies and feces." The Humane Society was created by special California statute, and it engages in a quasi-public function. Cal. Corp.Code § 14502. Humane Society officers are invested with authority to investigate reports of animal cruelty, impound animals, place liens on property, and bring criminal charges against citizens. *Id.* The Humane Society and its officers are state actors for the purposes of § 1983.

Initially, the Humane Society visited Brunette's ranch and issued an administrative Notice of Correction, which directed Brunette to seek veterinary care for some of her cats. The Humane Society then sought and obtained a search warrant for Brunette's ranch, including "all rooms in the residence, and outbuildings and vehicles." The warrant authorized the Humane Society to seize "sick, injured or dead animals," medications, and all documents evidencing the treatment of animals, as well as to "photograph . . . the premises."

Just prior to executing the warrant, the Humane Society invited the Ojai News and local television station KADY (Channel 6) to accompany the search of Brunette's ranch. The Ojai News circulates twice-weekly in a largely agrarian community for which stories about animals hold considerable interest. Not surprisingly, the Ojai News agreed to send reporter/photographer Dewar to cover the search. KADY, however, declined the Humane Society's invitation to attend.

Warrant in hand, the Humane Society proceeded to Brunette's ranch. Dewar was supposed to arrive at the ranch separately in his own vehicle. Accordingly, the Humane Society sought to delay commencement of the search until Dewar arrived at the ranch. Despite these efforts at delay, however, Dewar arrived after the Humane Society had severed Brunette's gate lock and begun the search. When Dewar finally arrived, officers stationed at Brunette's driveway invited him onto the property to observe the search and to take photographs for publication in the Ojai News. Dewar's only role during the search was to gather information as a reporter and a photographer. He rendered no assistance to the Humane Society and in no way facilitated its ability to search the premises. Ultimately, the Humane Society seized nearly forty cats, one Doberman Pinscher, and twelve feisty ducklings from Brunette's ranch. None of the animals seized was diseased, injured, or deceased.

Subsequently, Dewar wrote and the Ojai News published numerous articles and editorials decrying Brunette's mistreatment of animals and impugning her character. One article even suggested a "[m]andatory psychiatric evaluation" to "allow us an insight into [Brunette's] world which few of us can comprehend, appreciate, or sympathize." Most of the articles contained a photograph of a sickly animal, though

district court's dismissal of Brunette's other claims.

some of the animals pictured were not owned by Brunette.

As a result of this search and investigation, the Ojai Sheriff charged Brunette with criminal animal neglect. Brunette moved to suppress all the fruits of the search of her ranch. The Superior Court for the County of Ventura, Appellate Department, ruled that at the time of the search, the Humane Society lacked statutory authority to execute search warrants and therefore, its search of Brunette's ranch violated the Fourth Amendment. The Court consequently granted Brunette's motion to suppress and dismissed the charges against her.

Seeking further vindication, Brunette filed this action against the Media and the Humane Society, alleging a violation of her Fourth Amendment rights as well as a panoply of state law causes of action, including a violation of her state constitutional rights, trespass, invasion of privacy, conspiracy, conversion, and infliction of emotional distress. Brunette settled her suit against the Humane Society. The Media filed a motion to dismiss Brunette's complaint for failure to state a claim. The district court granted this motion to dismiss.

Brunette appealed.

## STANDARD OF REVIEW

We review de novo the district court's dismissal of a complaint for failure to state a claim. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir.1999). All factual allegations in the complaint must be accepted as true, and all reasonable inferences drawn in favor of Brunette. *See id.*

## DISCUSSION

■ Brunette claims that the Media violated her constitutional right to be free of unreasonable searches and seizures under the Fourth Amendment.[2] *See Dennis v. Sparks*, 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (recognizing suit for a private party's violation of another's Fourth Amendment rights). Although most rights secured by the Constitution are protected only against infringements by the government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), in certain circumstances, a litigant may seek damages under 42 U.S.C. § 1983 from a private party based on a violation of a constitutional right. Section 1983 liability extends to a private party where the private party engaged in state action under color of law and thereby deprived a plaintiff of some right, privilege, or immunity protected by the Constitution or the laws of the United States. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir.1985) (en banc).

■ As the first step in establishing the Media's § 1983 liability, Brunette must sufficiently plead that the Media engaged in state action. Whether a private party engaged in state action is a highly factual question. *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983) (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). Crucial is the nature and extent of the relationship between the Humane Society and the Media. *See Lugar*, 457 U.S. at 939, 102 S.Ct. 2744. "Only by sifting facts and weighing circumstances" can we hope to ferret out obvious as well as non-obvious State involvement in private conduct.

2. The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Burton,* 365 U.S. at 722, 81 S.Ct. 856. Several tests have emerged to evaluate whether a private actor has engaged in state action.

Brunette asks us to consider three distinct tests, each of which, she claims, independently demonstrates that the Media engaged in state action during the search of her ranch. First, the "joint action" test examines whether private actors are willful participants in joint action with the government or its agents. *See Dennis,* 449 U.S. at 27–28, 101 S.Ct. 183. Second, and derivative of the joint action test, the "symbiotic relationship" test asks whether the government has so far insinuated itself into a position of interdependence with a private entity that the private entity must be recognized as a joint participant in the challenged activity. *See Rendell Baker v. Kohn,* 457 U.S. 830, 842–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Last, the "public functions" test inquires whether the private actor performs functions traditionally and exclusively reserved to the States. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

## A. Joint Action Test

Brunette most strenuously complains that the Media, in cahoots with the Humane Society, unconstitutionally searched her ranch and seized her property. Brunette contends that because the Media and the Humane Society acted jointly, the otherwise private Media became a state actor liable under § 1983.

■ "The house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose." *Wilson v. Layne,* 526 U.S. 603, 609–10, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Semayne's Case,* 77 Eng. 194 (K.B.1604)). No one doubts Brunette's house is her castle; or that her ranch is her kingdom; or even that in appropriate circumstances one or the other

might be obtained in exchange for a horse. William Shakespeare, Richard III, act 5, sc. 2. However, the sanctity of Brunette's home is not inviolable and its depths not impenetrable. For example, a police officer executing a valid search warrant may enter Brunette's home. Despite this privilege to enter, the police officer's actions while executing the warrant must relate to the objectives of the authorized intrusion. *See Arizona v. Hicks,* 480 U.S. 321, 325, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). If the "scope of the search exceeds that permitted by the terms of a validly issued warrant ... [the search and any] subsequent seizure [are] unconstitutional." *Horton v. California,* 496 U.S. 128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

In *Wilson,* for example, police officers obtained a valid warrant to enter the Wilson home and arrest Dominic Wilson. 526 U.S. at 606, 119 S.Ct. 1692. Although media presence was not authorized by the warrant, the police officers invited a reporter and a photographer from the Washington Post to accompany them. *Id.* at 607, 119 S.Ct. 1692. Upon reaching the Wilson home, the media entered under the imprimatur of the warrant; the photographer took numerous pictures and the print reporter observed a confrontation between the police and the Wilsons. *Id.* In this circumstance, the Supreme Court held that it was "a violation of the Fourth Amendment for police to bring members of the media ... into a home during the execution of a warrant when the presence of the [media] in the home was not in aid of the execution of the warrant." *Id.* at 614, 119 S.Ct. 1692; *see also Buonocore v. Harris,* 65 F.3d 347, 356 (4th Cir.1995); *Ayeni v. Mottola,* 35 F.3d 680, 686 (2d Cir.1994).

Brunette argues that *Wilson* conclusively demonstrates that the Media incurred § 1983 liability because it participated in an illegal search of her ranch. We dis-

agree. *Wilson* speaks exclusively to whether a *police officer* violates the Fourth Amendment by inviting the media to ride-along during the execution of a search warrant. It provides no assistance in deciding whether the Media engaged in joint action sufficient to convert it into a state actor. To answer this question, we look to governing § 1983 case law outlining the joint action test.

To be engaged in joint action, a private party must be a "willful participant" with the State or its agents in an activity which deprives others of constitutional rights. *Dennis*, 449 U.S. at 27, 101 S.Ct. 183. A private party is liable under this theory, however, only if its particular actions are "inextricably intertwined" with those of the government. *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir.1996); *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir.1989) (necessitating a showing of "substantial cooperation" between the private party and the State). A conspiracy between the State and a private party to violate another's constitutional rights may also satisfy the joint action test. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Howerton*, 708 F.2d at 383; *United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1546–47 (9th Cir. 1989) (en banc).

We previously accepted the theoretical possibility of joint action between law enforcement and the media in *Berger v. Hanlon*, 129 F.3d 505, 514–16 (9th Cir.1997), *vacated and remanded by* 526 U.S. 808, 119 S.Ct. 1706, 143 L.Ed.2d 978 (1999), *judgment reinstated by* 188 F.3d 1155 (9th Cir.1999). In *Berger*, the United States Fish & Wildlife Service ("USFWS") investigated the Bergers for illegally killing protected birds of prey. 129 F.3d at 508. Upon hearing of the investigation, the Cable News Network ("CNN") approached the USFWS to vet the possibility of a

television deal. *Id.* CNN wanted footage for their environmental programs, and as it turned out, the USFWS was looking for an outlet to publicize its efforts combating environmental crime. *Id.* CNN and the Assistant United States Attorney executed a letter agreement allowing CNN to accompany the USFWS Agents "as they attempt to execute a criminal search warrant near Jordan, Montana, some time during the week of March 22, 1993." *Id.*

On March 18, 1993, a magistrate judge issued a search warrant for the Bergers' ranch and appurtenant structures, excluding the residence; the warrant was silent as to CNN's participation in the search. *Id.* The day before the search, CNN participated in a pre-search briefing which included the dissemination of sealed, confidential information about the Bergers. *Id.* at 509. On the morning of the search, the USFWS and CNN gathered on a country road near the Bergers' ranch to discuss again the search. *Id.* CNN then proceeded with the USFWS in a caravan of ten vehicles to a point near the Bergers' ranch. *Id.*

CNN mounted video cameras both inside and outside the USFWS vehicles, and at least one USFWS Agent wore a hidden microphone, which continuously transmitted live audio to the CNN technical crew. By the end of the search, CNN had recorded more than eight hours of videotape.

We found that "[t]his was no ordinary search." *Id.* at 509. "It was jointly planned by law enforcement officials and [CNN], as memorialized by a written contract, so that the officials could assist [CNN in] obtaining material for their commercial programming." *Id.* "This search[stood] out as one that at all times was intended to serve a major purpose other than law enforcement." *Id.* Nothing was passive about USFWS's involvement with CNN. *Id.* at 512. "They acted to-

gether." *Id.* at 516. Considering the "inextricable involvement of [CNN] with both the planning and execution of th[e] search," the USFWS's active involvement with CNN's news gathering activities, and the mutual benefits derived by CNN and the USFWS, we found "more than enough" to conclude that CNN's actions were those of a state actor. *Id.* at 515 (citations omitted).

 In this case, Brunette seeks to analogize her case to the facts in *Berger.* She hinges her claim on two factual allegations: (1) pursuant to a long-standing custom to invite the Media to observe and photograph the execution of search warrants, the Humane Society notified the Media of an imminent raid on Brunette's ranch; and (2) when Dewar arrived at the ranch, the Humane Society invited him to enter the premises and observe and photograph the search.

Ultimately, however, Brunette's contentions fail. Brunette's allegations do not establish any substantial cooperation or inextricably intertwined activity between the Media and the Humane Society. Brunette alleged that an amorphous long-standing custom facilitated the Media's presence at Brunette's ranch. While we accept that allegation as true, unlike the letter agreement in *Berger,* the Media did not contract with the Humane Society to accompany it on this raid specifically. The generalized allegation of a wink and a nod understanding between the Media and the Humane Society does not amount to an agreement or a conspiracy to violate Brunette's rights in particular. Indeed, the Media did not participate in any discussions about Brunette prior to the issuance

of the warrant, and in fact, it had no knowledge of Brunette or the animal cruelty complaints against her until the imminent execution of the search warrant.

Unlike CNN in *Berger,* the Media neither planned the raid nor participated in any preraid briefings. Nor did the Humane Society in this case disclose to the Media any confidential information like the USFWS disclosed to CNN in *Berger.* Moreover, Dewar arrived at Brunette's ranch independently in his own vehicle, *after* the Humane Society had cut the gate lock and begun to search.

Upon Dewar's arrival at the ranch, the Humane Society invited him to enter the premises and observe and photograph the execution of the warrant. But unlike the USFWS in *Berger,* the Humane Society did nothing to facilitate the Media's news gathering mission. Humane Society officers were not outfitted with video cameras or surreptitiously miked for sound.

Although simultaneously present at Brunette's ranch, the Humane Society and the Media acted independently. The Media retained control over what footage to photograph and which events to memorialize. Neither the Media nor the Humane Society assisted the other in performance of its separate and respective task. Dewar's news gathering mission was entirely distinct from the Humane Society's investigation of animal cruelty charges. Indeed, as part of the Humane Society's investigation it photographed and filmed the search independently.[3] Lacking was the requisite substantial cooperation between the Media and the Humane Society.

---

**3.** While we note that the Humane Society's warrant authorized photography of Brunette's ranch, our reasoning does not rely upon the reasoning found in *Stack v. Killian,* 96 F.3d 159 (6th Cir.1996). In that case, a television crew participated in and filmed the execution

of a search warrant. *Id.* at 163. The Sixth Circuit condoned this activity because the warrant authorized "videotaping and photographing" even though it "said nothing about a television crew." *Id.*

As opposed to the search in *Berger*, this was an ordinary search to which the Humane Society invited the Media at the last minute.[4] During the search, the Media's actions were its own; they were not "state actions" directed by or jointly conceived, facilitated or performed by the Humane Society. Because the Media was not a state actor during the search, it cannot be held liable under § 1983.

## B. Symbiotic Relationship Test

**Where a private party and the government exist via** what amounts under the law to a "symbiotic relationship" (like oxpeckers and rhinoceros), we have held the private party responsible as a state actor under § 1983. In a symbiotic relationship the government has "so far insinuated itself into a position of interdependence (with a private entity) that it must be recognized as a joint participant in the challenged activity." *Burton*, 365 U.S. at 725, 81 S.Ct. 856. In *Burton*, for example, the Supreme Court found state action on the part of a privately-owned restaurant which refused to serve African–American customers. *Id.* at 716, 81 S.Ct. 856. The restaurant was located in a public parking garage, benefitted from the Parking Authority's tax exemption and maintenance of the premises, and in turn, provided the Parking Authority with the income it needed to maintain fiscal viability. *Id.* at 719–20, 81 S.Ct. 856. Although the Parking Authority had no part in the restaurant's discriminatory policies, the Court found that its relationship was one of interdependence; the Parking Authority had placed its power, property, and prestige behind the restaurant's discrimination, and thereby had become a joint participant in that discrimination. *Id.* at 725, 81 S.Ct. 856.

*Burton* teaches that substantial coordination and integration between the private entity and the government are the essence of a symbiotic relationship. Often significant financial integration indicates a symbiotic relationship. *See Rendell Baker*, 457 U.S. at 842–43, 102 S.Ct. 2764; *Vincent v. Trend W. Tech. Corp.*, 828 F.2d 563, 569 (9th Cir.1987). For example, if a private entity, like the restaurant in *Burton*, confers significant financial benefits indispensable to the government's "financial success," then a symbiotic relationship may exist. *Vincent*, 828 F.2d at 569. A symbiotic relationship may also arise by virtue of the government's exercise of plenary control over the private party's actions. *See Dobyns v. E–Systems, Inc.*, 667 F.2d 1219, 1226–27 (5th Cir.1982) (finding symbiotic relationship where the government controlled a private peacekeeping force engaged in a government-directed field mission in the Sinai Peninsula).

■ Here, Brunette asserted no relationship remotely sufficient to establish a symbiotic relationship between the Hu-

---

4. In some material respects our case closely parallels *Parker v. Boyer*, 93 F.3d 445 (8th Cir.1996). In that case, KSDK television contacted the St. Louis Police Department and told them it was interested in developing a story about police efforts to eradicate illegal weapons. *Id.* at 446. Sometime later, the police told KSDK about a weapons investigation in progress. *Id.* KSDK accompanied the police on an evening search of a private residence. *Id.* at 446–47. The entourage entered the house through an unlocked door; KSDK filmed while the police searched the residence. The Eighth Circuit held:

> It is undisputed that KSDK acted independently of the police in deciding to enter the house and videotape the events there and that neither KSDK nor the police assisted the other in the performance of their separate and respective tasks. The KSDK personnel did not execute the search warrant and they entered the house after the police did. The television station was there for reasons of its own and was engaged in a mission entirely distinct from the one that brought the police to the house.
>
> *Id.* at 448.

mane Society and the Media. She did not allege that the Humane Society and the Media were financially integrated. Nor did she allege the Media rendered any service indispensable to the Humane Society's continued financial viability. With or without the Media, the Humane Society, funded by the State, would continue to execute its mission protecting animals from abuse and cruelty. Certainly, Brunette did not claim the Humane Society ever exercised any editorial or executive control over the Media, its gathering of news, or its publication decisions.

What Brunette did allege was a long-standing custom by the Humane Society to allow the Media to observe and photograph the execution of search warrants. This custom, Brunette asserted, ensured that the Humane Society received free publicity and the Media received "a steady source of sensational stories." These allegations, even if true, do not demonstrate that the Humane Society or the Media is indispensable, in any way, to the other's continued business operation or financial success. Ultimately, any exchange of "mutual benefits" between the Humane Society and the Media falls far short of creating the substantial interdependence legally required to create a symbiotic relationship.

## C. Public Function Test

**Finally, we are not persuaded by Brunette's contention** that the Media became a state actor under the public functions test. Private activity becomes a "public function" only if that action has been "traditionally the exclusive prerogative of the State." *Rendell Baker*, 457 U.S. at 842, 102 S.Ct. 2764 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)); *see also Vincent*, 828 F.2d at 569 (finding repair of fighter jets a traditional function of the government, but not one of its exclusive prerogatives). If private actors hold elections, *Terry*, 345 U.S. at 484, 73 S.Ct. 809, gov-

ern a town, *Marsh v. Alabama*, 326 U.S. 501, 507–09, 66 S.Ct. 276, 90 L.Ed. 265 (1946), or serve as an international peacekeeping force, *Dobyns*, 667 F.2d at 1226–27, they have been held responsible as state actors. On the other hand, if private actors educate "maladjusted" youth, *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. 2764, or resolve credit disputes, they have not been held to perform an exclusive prerogative of the State, and thus, they have not been held responsible as state actors. *Flagg Bros.*, 436 U.S. at 157–60, 98 S.Ct. 1729.

■ Brunette argues that the Media entered her ranch under the imprimatur of the Humane Society's warrant and proceeded to search as though "part of the search brigade." In her complaint, however, Brunette conceded that the Media did not engage in any law enforcement activity during the search of her ranch, and indeed, the record reflects that the Media limited its activities during the search to photographing and videotaping. While law enforcement and the execution of search warrants may be the exclusive prerogative of the State, gathering news is not so regarded. Newsgathering is the quintessential private activity, jealously guarded from impermissible government influence.

Because the Media engaged in no public function during the search of Brunette's ranch, it was not liable as a state actor under § 1983.

## CONCLUSION

During the objectionable search of Brunette's ranch the Media acted as a private spectator rather than a state actor; thus, it incurred no § 1983 liability.

AFFIRMED.