**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARLES H. WILSON; GERALDINE E.
WILSON; RAQUEL WILSON, next
friend/mother of Valencia Snowden,
a minor,
Plaintiffs-Appellees,

v.

HARRY LAYNE, Deputy, United
States Marshal, Supervisor for the
Washington Area, Operation
Gunsmoke; JOSEPH L. PERKINS;
JAMES A. OLIVO,                                    No. 96-1185
Defendants-Appellants,

and

RAYMOND M. KIGHT, Sheriff,
Montgomery County, Maryland;
JOHN DOE, Unknown Sheriff's
Deputies; JOHN DOE, Unknown U.S.
Marshals; UNITED STATES OF
AMERICA; ERIC E. RUNION; MARK A.
COLLINS; BRIAN E. ROYNESTAD,
Defendants.

CHARLES H. WILSON; GERALDINE E.
WILSON; RAQUEL WILSON, next
friend/mother of Valencia Snowden,
a minor,
Plaintiffs-Appellees,

v.

MARK A. COLLINS; ERIC E. RUNION;
BRIAN E. ROYNESTAD,
Defendants-Appellants,

and

No. 96-1188

RAYMOND M. KIGHT, Sheriff,
Montgomery County, Maryland;
JOHN DOE, Unknown Sheriff's
Deputies; HARRY LAYNE, Deputy,
United States Marshal, Supervisor
for the Washington Area, Operation
Gunsmoke; JOHN DOE, Unknown
U.S. Marshals; UNITED STATES OF
AMERICA; JOSEPH L. PERKINS; JAMES
A. OLIVO,
Defendants.

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-94-1718-PJM)

Argued: March 3, 1998

Decided: April 8, 1998

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON,
LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges.

_____

2

Reversed by published opinion. Judge Wilkins wrote the majority opinion, in which Chief Judge Wilkinson and Judges Niemeyer, Luttig, and Williams joined. Judge Widener wrote a concurring opinion. Judge Murnaghan wrote a dissenting opinion, in which Judges Ervin, Hamilton, Michael, and Motz joined.

_____

**COUNSEL**

**ARGUED:** Richard Adams Cordray, Grove City, Ohio, for Appellants. Richard Alan Seligman, Washington, D.C., for Appellees. **ON BRIEF:** Stuart M. Nathan, John B. Howard, Jr., OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. David H. Coburn, James S. Felt, STEPTOE & JOHNSON, L.L.P., Washington, D.C.; Arthur B. Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C., for Appellees.

_____

**OPINION**

WILKINS, Circuit Judge:

Charles H. Wilson and Geraldine E. Wilson (the Wilsons)[1] brought this action against federal and state law enforcement officers and others not pertinent to this appeal. The Wilsons allege that their Fourth and Fourteenth Amendment rights were violated when officers entered their home and sought to execute an arrest warrant for their son. See 42 U.S.C.A. § 1983 (West 1994); Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395-97 (1971). The district court granted summary judgment in part in favor of the officers, but refused to do so on the Wilsons' claim that the officers violated the Fourth Amendment by permitting two newspaper

_____

[1] Raquel Wilson joined the Wilsons as a plaintiff in this action on behalf of her daughter Valencia Snowden, the Wilson's grandchild who was present during a portion of the actions that form the basis of this lawsuit. For ease of reference, however, we refer only to the Wilsons as prosecuting this litigation.

reporters to accompany them into the Wilsons' home and photograph the officers' attempt to execute the arrest warrant. The officers appeal from the decision of the district court denying them qualified immunity with respect to this claim. We reverse.[2]

I.

The material facts are not disputed. On April 14, 1992, federal and state law enforcement agents were engaged in a joint effort to apprehend fugitives with a history of armed, violent, criminal conduct. A team composed of Joseph L. Perkins and James A. Olivo of the United States Marshals Service and Mark A. Collins, Brian E. Roynestad, and Eric E. Runion of the Montgomery County, Maryland Sheriff's Department was formed to execute an outstanding arrest warrant. The warrant stated:

> THE STATE OF MARYLAND, TO ANY DULY AUTHORIZED PEACE OFFICER, GREETINGS: YOU ARE HEREBY COMMANDED TO TAKE DOMINIC JEROME WILSON IF HE/SHE BE FOUND IN YOUR BAILIWICK
> ....

J.A. 124. In addition, two newspaper reporters, one outfitted with a stillshot camera, were to accompany the officers to observe and chronicle the execution of the warrant.[3] The reporters' participation was part of a two-week, news-gathering activity by the newspaper.

During the early morning hours, the officers proceeded to the address listed in police reports, as well as probation and court records, as the fugitive's home. Upon entering the residence, the officers encountered a man dressed only in undergarments who was very

_____

[2] A panel of this court earlier issued a decision reversing the district court. See Wilson v. Layne, 110 F.3d 1071 (4th Cir. 1997). A majority of the judges in active service subsequently voted to consider this appeal en banc. After this hearing, a majority of the judges in active service voted to rehear this appeal en banc.

[3] At the time, the United States Marshals Service had adopted a written policy permitting members of the news media to "ride along" with its law enforcement officers in order to observe and record operational missions.

4

angry because of the intrusion. The confrontation between the man and the officers ultimately resulted in the officers subduing the man on the floor. In the meantime, a woman dressed in a sheer nightgown emerged from the back of the house. These two individuals were later identified as the Wilsons. The subject of the warrant, the Wilsons' son, was not present. Throughout these events, the reporters observed and photographed what transpired.[4]

The Wilsons subsequently brought this action against the federal and state officers who comprised the arrest team that entered their home; the team's supervisor, Harry Layne; and others not pertinent to this appeal. The Wilsons asserted that their constitutional rights under the Fourth and Fourteenth Amendments were violated by the officers' actions in three ways: (1) the officers used excessive force in attempting to execute the arrest warrant; (2) the officers lacked probable cause to believe that the fugitive would be found at the Wilsons' home; and (3) the officers permitted representatives of the media to enter the Wilsons' home to observe and photograph the execution of the arrest warrant. Ruling on the officers' motion for summary judgment, the district court dismissed the allegations of excessive force and lack of probable cause, concluding that the evidence viewed in the light most favorable to the Wilsons demonstrated that the amount of force the officers employed was reasonable and that the officers possessed probable cause to believe that the fugitive they sought would be found at the Wilsons' home. However, the district court rejected the officers' assertions that allowing the reporters to enter the Wilsons' home without their consent did not violate their constitutional rights. Furthermore, the district court refused to accept the officers' alternative argument that, at a minimum, they were entitled to qualified immunity because in April 1992, the law was not clearly established that permitting members of the media to accompany law enforcement officers into a private residence during the execution of an arrest warrant was unconstitutional. The officers appeal this latter ruling.[5]

_____

[4] These photographs have never been published.
[5] The district court denied the Wilsons' request to certify for immediate appeal its rulings with respect to the allegations of excessive force and lack of probable cause to permit those issues to be considered in conjunc-

5

II.

A.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." E.g., Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982); Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs , 475 U.S. 335, 341 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Thus, although the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. See Anderson v. Creighton, 483 U.S. 635, 640 (1987); Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless `clearly established' for qualified immunity purposes" and that "`[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). The law is clearly established such that an officer's conduct transgresses a bright line when the law has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980); see Cullinan

_____

tion with the appeal of the question of the officers' entitlement to qualified immunity. As a result, the only issue pending before us is the qualified immunity inquiry. And, because the facts are undisputed, this question presents a purely legal inquiry into whether the law was clearly established when the underlying events occurred. Thus, we may properly consider this appeal. See Johnson v. Jones, 515 U.S. 304, 313 (1995); Winfield v. Bass, 106 F.3d 525, 528-30 (4th Cir. 1997) (en banc).

6

v. Abramson, 128 F.3d 301, 311 (6th Cir. 1997) (explaining that "[o]rdinarily, at least, in determining whether a right is `clearly established' this court will not look beyond Supreme Court and Sixth Circuit precedent"), petition for cert. filed , 66 U.S.L.W. ___ (U.S. Feb. 19, 1998) (No. 97-1342); Jenkins ex rel. Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997) (en banc) (explaining that "the law can be `clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court,[the] Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose"), cert. denied, 118 S. Ct. 412 (1997).

In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct. See Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996). The court then must consider whether, at the time of the claimed violation, that right was clearly established and "`whether a reasonable person in the official's position would have known that his conduct would violate that right.'" Id. (quoting Gordon v. Kidd , 971 F.2d 1087, 1093 (4th Cir. 1992)). Our review of the denial of summary judgment based on qualified immunity is de novo. See Pritchett, 973 F.2d at 313.

B.

The constitutional right that the Wilsons claim the officers violated, defined at the appropriate level of specificity, is their Fourth Amendment right to avoid unreasonable searches or seizures resulting from the officers' decision to permit members of the media who were not authorized to execute the warrant to enter into a private residence, without the homeowners' consent, to observe and photograph the execution of an arrest warrant. The question before us, then, is whether in April 1992 this right was clearly established and whether a reasonable officer would have understood that the conduct at issue violated it.

The Fourth Amendment provides in pertinent part,"The right of the people to be secure in their ... houses ... against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. By 1992, the Supreme Court had ruled that an entry into a home without a warrant is per se unreasonable unless an exception to the war-

7

rant requirement, such as exigent circumstances, exists. See Payton v. New York, 445 U.S. 573, 588-90 (1980); Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971). And, it is equally well settled that an officer executing a warrant is limited to those actions expressly authorized by the warrant, see Bivens, 403 U.S. at 394 n.7, or implicitly authorized because they are reasonable to advance a legitimate law enforcement purpose relating to the warrant or to ensure the officer's or the public's safety, see Michigan v. Summers , 452 U.S. 692, 705 (1981). See also Lawmaster v. Ward, 125 F.3d 1341, 1349 (10th Cir. 1997) (explaining that "because the touchstone of the constitutionality of an officer's conduct during a search is reasonableness, when executing a search warrant, an officer is limited to conduct that is reasonably necessary to effectuate the warrant's purpose").

Here, the officers entered the Wilsons' home pursuant to a valid arrest warrant. The officers did not exceed the scope of the warrant by permitting the reporters who accompanied them into the Wilsons' home to engage in activities that the officers could not themselves have undertaken consistent with the warrant. Specifically, the reporters did not conduct a search of, or intrude into, any areas of the Wilsons' home into which the officers would not have been permitted to go in executing the arrest warrant. Further, the reporters' photographs of the events did not amount to a seizure. The Supreme Court has indicated that a seizure occurs only when there has been a "meaningful interference with an individual's possessory interests in ... property." United States v. Jacobsen, 466 U.S. 109, 113 (1984); see also Arizona v. Hicks, 480 U.S. 321, 324 (1987) (recording the serial numbers on equipment "did not meaningfully interfere with respondent's possessory interest in either the serial numbers or the equipment, and therefore did not amount to a seizure" (internal quotation marks omitted)). But see Ayeni v. Mottola, 35 F.3d 680, 688 (2d Cir. 1994). An application of this definition indicates that the photographic images captured by the reporters were not seized within the meaning of the Fourth Amendment. But, just as importantly for our purposes, it certainly was not clearly established that photographing an arrest constituted a seizure of the images recorded. Thus, reasonable officers under these circumstances had no clearly established law from the Supreme Court, this court, or the Court of Appeals of Maryland from which they necessarily understood that they exceeded the scope of an

8

arrest warrant by permitting reporters to engage in activities in which they themselves could have engaged consistent with the warrant.

Furthermore, even if we were to agree with the Wilsons that in 1992 it was clearly established that the Fourth Amendment was violated if officers permitted third parties who were not expressly authorized by the warrant and who were not assisting reasonable law enforcement efforts related to the execution of the warrant to accompany them into a residence, we could not conclude that it was clearly established that the conduct in which these officers engaged manifestly fell within the ambit of that rule. When this incident took place in 1992, there was no clear law from the Supreme Court, this court, or the Court of Appeals of Maryland establishing that permitting reporters to observe and photograph the events surrounding the execution of an arrest warrant may not serve a legitimate law enforcement purpose related to execution of the warrant. And, reasonable law enforcement officers might conclude that permitting media representatives to observe and photographically record the execution of an arrest warrant does serve such a purpose. For example, the purpose may be served by affording protection to the officers by reducing the possibility that the target of a warrant will resist arrest in the face of recorded evidence of his actions. Additionally, it could be asserted that facilitating accurate reporting that improves public oversight of law-enforcement activities is a legitimate law enforcement purpose because it deters crime, as well as improper conduct by law enforcement officers. In any event, we conclude that reasonable law enforcement officers could have believed that permitting the reporters to observe and photograph the execution of the arrest warrant advanced a legitimate law enforcement purpose related to the execution of the warrant.

The dissent acknowledges that neither the Supreme Court nor this court had in 1992 addressed whether law enforcement officers violate the Fourth Amendment by permitting media representatives to accompany them into a private residence to observe and photograph the officers' execution of an arrest warrant. The dissent nevertheless contends that our conclusion that the officers are entitled to qualified immunity is erroneous, asserting that it was clearly established that the Fourth Amendment prohibited government agents from bringing a private citizen into a home to conduct an independent search or sei-

9

zure. In support of its argument, the dissent points to the decision of this court in Buonocore v. Harris, 65 F.3d 347 (4th Cir. 1995),**6** and to those of three other courts of appeals holding on facts similar to those at issue here that officers were not entitled to qualified immunity, see Berger v. Hanlon, 129 F.3d 505 (9th Cir. 1997);**7** Ayeni v. Mottola, 35 F.3d 680 (2d Cir. 1994);**8** Bills v. Aseltine, 958 F.2d 697

_____

**6** In Buonocore, an opinion decided long after the events at issue here, officers allowed a security guard to enter a private residence and conduct an independent search for property not authorized by a warrant. Buonocore, 65 F.3d at 350-51. In the appeal from the denial of summary judgment to the officers, we characterized the issue presented as whether it was clearly established on November 24, 1992 that"Fourth Amendment law prohibited government agents from bringing a private citizen into Buonocore's home to conduct an independent, general search for items not identified in any warrant." Id. at 353 (internal quotation marks omitted). And, we held that it was, reasoning:

> [W]e have no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not reasonable. It obviously exceeds the scope of the required specific warrant and furthermore violates the sanctity of private dwellings.

Id. at 356 (internal quotation marks omitted). Buonocore, therefore, addressed the question of whether a third party, who is not authorized by the warrant to conduct a search, may accompany law enforcement officers in executing a warrant and undertake an independent search for items not described in the warrant. Of course, the officers here permitted no such general independent search by the reporters.

**7** In Berger, decided more than five years after the events at issue here, the Court of Appeals for the Ninth Circuit ruled that officers who permitted media representatives to accompany them in executing a search warrant for a private purpose not related to law enforcement efforts in 1993 were not entitled to qualified immunity. See Berger, 129 F.3d at 510-12.

**8** In Ayeni, decided in 1994, the Court of Appeals for the Second Circuit held that it was clearly established in March 1992 that officers violated the Fourth Amendment when they permitted a television crew to enter a private residence and film the execution of a search warrant that provided no authorization for their presence. See Ayeni, 35 F.3d at 684-86. The court reasoned that although there were no decisions expressly

10

_____

holding that searching agents violate the Constitution by bringing members of the press into a home to observe and report on their activities, it had

> long been established that the objectives of the Fourth Amendment are to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties and that, in the normal situations where warrants are required, law enforcement officers' invasion of the privacy of a home must be grounded on either the express terms of a warrant or the implied authority to take reasonable law enforcement actions related to the execution of the warrant.

Id. at 686. Furthermore, the court held that an objectively reasonable officer could not have failed to appreciate "that inviting a television crew --or any third party not providing assistance to law enforcement--to participate in a search was [not] in accordance with Fourth Amendment requirements." Id.

**9** In Bills, which was decided approximately one month prior to the incident under review, the court held that law enforcement officers may violate the Fourth Amendment by permitting a security guard to accompany them into a private residence to execute a search warrant and to engage in an independent search for items that were not described in the warrant. See Bills, 958 F.2d at 702-05. The court explained:

> [W]here an intrusion is justified, whether by warrant or by probable cause and exigent circumstances, police are temporarily placed in control of the premises and its occupants. It is as though the premises were given to the officers in trust for such time as may be required to execute their search in safety and then depart. Officers in unquestioned command of a dwelling may violate that trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises. The warrant in this case implicitly authorized the police officers to control and secure the premises during their search .... It did not implicitly authorize them to invite a private security officer to tour plaintiff's home for the purpose of finding [evidence not specified in the search warrant] ....

11

The decisions on which the dissent relies, however, do not persuade us that the officers are not entitled to qualified immunity. Reliance on decisions issued after the events underlying this litigation, whether the decisions were decided by this court or others, is inappropriate. See Mitchell v. Forsyth, 472 U.S. 511, 533-35 (1985). Certainly law enforcement officers need not correctly anticipate future constitutional rulings on pain of personal liability. Further, as noted above, reliance on decisions from other circuits to determine that a given proposition of law is clearly established is inappropriate as a general matter, and we find no basis to depart from the general rule in this instance. Thus, the decisions of the other circuit courts of appeals cannot support a conclusion that the law was clearly established in our circuit. And finally, subsequent to the events giving rise to this litigation, at least one other court of appeals has held on similar facts that law enforcement officers were entitled to qualified immunity. See Parker v. Boyer, 93 F.3d 445, 447 (8th Cir. 1996), cert. denied, 117 S. Ct. 1081 (1997). Relying on the dearth of authority holding the conduct in question to be violative of the Fourth Amendment, the existence of decisions holding that these types of actions by law enforcement officers did not transgress constitutional principles,[10]

_____

Id. at 704-05 (internal quotation marks omitted). Based on this reasoning, the Court of Appeals for the Sixth Circuit held that the officers' conduct presented a jury question concerning whether the officers had exceeded the scope of the search warrant and remanded for further proceedings. See id. at 705.

[10] Early cases considering the constitutionality of law enforcement officers allowing members of the media to enter a private residence to observe or record the execution of a warrant are scarce. The few decisions that we have located on this issue are uniform in concluding that such conduct does not violate constitutional principles. See Moncrief v. Hanton, 10 Media L. Rep. (BNA) 1620, 1621-22 (N.D. Ohio Jan. 6, 1984) (rejecting argument that police violated the Fourth Amendment by permitting media to enter home and film arrest on the basis that no protected privacy interest was violated); Higbee v. Times-Advocate, 5 Media L. Rep. (BNA) 2372, 2372-73 (S.D. Cal. Jan. 9, 1980) (declining to accept plaintiff's assertion that officers violated his constitutional rights by inviting the press to be present during the execution of a search warrant at his residence); Prahl v. Brosamle, 295 N.W.2d 768, 774 (Wis. Ct.

12

and the lack of Supreme Court direction on the question, the Parker court held that officers were entitled to qualified immunity. See id. Given that reasonable jurists can differ on this question, we cannot say that the law was so clear that a reasonable officer must have known his actions transgressed constitutional bounds.

In asserting that no reasonable officer could have believed that the reporters were serving a legitimate law enforcement purpose, the dissent misunderstands the distinction between the reporters' aid in the actual execution of the warrant and other legitimate law enforcement purposes that the reporters may have facilitated by accompanying the officers to observe and record the attempt to execute the warrant. The dissent equates these two distinct concepts, assuming that unless, as a matter of historical fact, the officers intended for the reporters actually to assist in the execution of the arrest warrant, reasonable officers must have known "full well that the reporters served no legitimate law enforcement purpose." Dissent at 27. In support of its argument that the officers did not intend for the reporters to aid in the actual execution of the warrant, the dissent quotes a portion of the statement of the facts in the panel opinion, which observed that the reporters accompanied the officers as part of a two-week news gathering operation that was not designed to serve a law enforcement purpose. The dissent also relies on a portion of the officers' brief in which they acknowledge that the reporters "were not involved in executing the warrant" but instead were "mere bystanders." Id. at 27 (internal quotation marks omitted).

While it is undoubtedly true that neither the reporters nor the officers envisioned that the reporters would provide assistance to the officers in actually executing the arrest warrant, it is equally true that reasonable officers may have perceived that permitting the reporters to accompany them served a legitimate law enforcement function. Indeed, the media ride-along policy pursuant to which the reporters

_____

App. 1980) (rejecting claim that officers infringed the Fourth Amendment by allowing a television reporter to enter plaintiff's property and film search, reasoning "that the filming and television broadcast of a reasonable search and seizure, without more, [do not] result in unreasonableness").

13

accompanied the officers indicated that keeping the public informed of the activities of the Marshals Service was a duty of that agency and that media ride alongs advanced that interest. Further, reasonable officers may have believed that the obvious increase to their safety afforded by the presence of the reporters constituted a legitimate law enforcement purpose.[11] Moreover, the dissent overlooks that although the officers have readily acknowledged that there was no intent that the reporters aid in the execution of the warrant, the officers consistently have maintained that it was reasonable to believe that the reporters' presence served a legitimate law enforcement purpose:

> [I]t is in fact a legitimate function of law enforcement to facilitate accurate reporting on law-enforcement activities and to improve public oversight of those activities by use of the press. These efforts are important because both the deterrence of crime and the deterrence of improper conduct by law-enforcement officers are vital to the broader mission. The formal policy of the United States Marshals Service ... was directed to these ends.

Reply Brief of Appellants at 6-7 (footnote omitted).

Because the dissent fails to understand the distinction between an intent that the reporters assist in the actual execution of the warrant and a reasonable belief that permitting the reporters to accompany the officers served a legitimate law enforcement purpose, the dissent incorrectly concludes that no reasonable law enforcement officer who knew the former could believe the latter. Rather, in our view, a reasonable law enforcement officer apprised of the fact that the officers did not intend for the reporters to assist in actually executing the warrant nevertheless reasonably could have concluded that permitting the reporters to accompany them while executing the warrant served a legitimate law enforcement purpose.

_____

[11] Of course, we do not hold that these purposes actually justified the reporters' presence while the warrant was executed; we merely hold that in the absence of clearly established law holding that they were not adequate to warrant their presence, reasonable officers may have believed them to be.

14

III.

We stress that we do not address whether the officers' conduct was constitutional or appropriate, only whether the legal landscape when these events occurred was sufficiently developed that it would have been obvious to reasonable officers that the actions at issue were violative of the Fourth Amendment. Because in April 1992 it was not clearly established that permitting media representatives to accompany law enforcement officers into a private residence to observe and photograph their attempt to execute an arrest warrant would violate the homeowner's constitutional rights, we hold that these officers are entitled to qualified immunity. Consequently, we reverse the decision of the district court refusing to grant summary judgment in favor of the officers.

REVERSED

WIDENER, Circuit Judge, concurring:

I concur in the result obtained by the majority.

I also concur in all of the majority opinion except the four sentences commencing with "and" on page 9, line 15, and ending with "warrant" on page 9, line 29. The conclusion there mentioned is not a question before us, and I would not express an advisory opinion upon it.

MURNAGHAN, Circuit Judge, dissenting:

News media (principally newspapers, journals, magazines, television and radio) have an abiding interest in collecting information and observing events connected with such information whenever they occur. The media most naturally find criminal activities and steps to punish the perpetrators fascinating to their readers, viewers and listeners. What goes on in court or what brings matters to court are high on the media's list of matters of interest. Understandably media devote much attention to the arrest of those accused of crime and a photograph of one being so arrested would be much desired by the media.

15

Not surprisingly, riding along with the police is regarded as a most valuable method of securing photographs and interviews with those sought by the police. Riding along causes few legal problems when done on the street or in other public places. However, some of the most interesting arrests occur in private locations, especially private homes. An intrusion into a home necessitates, in virtually every case, a warrant from a judicial officer, except where one of a few specifically established and well-delineated exceptions applies. When requested, such a warrant in virtually every case is issued to the police.

On April 14, 1992, Judge Ruben of Maryland's Sixth Judicial Circuit issued three warrants for the arrest of Dominic Jerome Wilson. The warrants were addressed "to any duly authorized peace officer." The warrants made no mention of where the arrest was to take place nor of joining a news reporter or a photographer to the team executing the warrant nor of the need for such person's assistance in the police execution of the warrant. Nevertheless, the team of Deputy U.S. Marshals and Montgomery County police officers (hereinafter "the police" or "the officers") invited a newspaper reporter and photographer seeking a story to accompany the police during the execution of the warrant. The police allowed the reporters to enter the private home of Dominic Jerome Wilson's parents without their permission, to observe the execution of the warrants issued to the police, and to photograph the Wilsons in a state of undress and under humiliating circumstances.

It has long been established that a police officer executing a warrant is limited to those actions "strictly within the bounds set by the warrant," Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 394 n.7 (1971), or reasonably necessary for its execution, see Michigan v. Summers, 452 U.S. 692, 705 (1981). The police officers violated these clearly established Fourth Amendment principles when they invited newspaper reporters to enter a private home and photograph the residents for purely commercial newspaper purposes during the execution of an arrest warrant. The reporters were not there to involve themselves in such execution. The ride-along policy of the Department of Justice by which it was attempted to justify their presence stated that the reporters riding along were there to see and record what actually happens. Neverthe-

16

less, the en banc majority grants the officers immunity for their actions in permitting the reporters' invasion of the privacy of the home to which the Wilsons were entitled. The majority presents post-hoc rationalizations to support its assertion that the defendants could have believed that inviting the reporters into the home was reasonably necessary to serve the purposes of the arrest warrants. Such a ruling seeks to convert qualified immunity to absolute immunity.[1]

No reporters' presence was mentioned in the warrants, and there were no exigent circumstances justifying warrantless action. Because no reasonable police officer could have believed that inviting the reporters into the home or allowing the photographer to take pictures either was authorized by the warrant or was reasonably necessary to accomplish its legitimate law enforcement purposes, the police officers' actions amounted to unreasonable searches and seizures in violation of clearly established Fourth Amendment law. I vigorously dissent.

I.

At 6:45 on the morning of April 14, 1992, a team of deputy U.S. Marshals and Montgomery County Police Officers entered the home of Charles and Geraldine Wilson. The officers were there to execute arrest warrants for Dominic Wilson, the Wilsons' adult son. It is to be emphasized that the police and deputy Marshals had no further

_____

[1] The majority has not argued that an exception to the warrant requirement justified the search. See Mincey v. Arizona , 437 U.S. 385, 390 (1978) ("The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that `searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions.'" (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980) (explaining that, to justify a warrantless search for the subject of an arrest warrant in the home of a third party, "not only must the officers have probable cause to believe the person named in the arrest warrant is on the premises of the third person, but there must also exist an appropriate exception to the warrant requirement," such as "exigent circumstances"). Clearly no such exception was "specifically established and well delineated."

17

powers conferred on them by the arrest warrants and no mention was made in the warrants of media presence.

Pursuant to the U.S. Marshals' Ride-Along policy, they had invited a reporter and a photographer from the <u>Washington Post</u> to accompany them on their mission.[2] The policy explained that "ride-alongs, as the name implies, are simply opportunities for reporters and camera crews to go along with Deputies on operational missions so they can see, and record, what actually happens." The police officers concede that the reporters "were not involved in executing the warrant," Brief of Appellants at 8, 12, but were "mere bystanders," <u>id.</u> at 8.[3] Although the policy instructed the Marshals to "establish ground rules" with the reporters, including "what can be covered with cameras and when, [and] any privacy restrictions that may be encountered," the officers exercised no control over the reporters or what they photographed, even once inside the Wilsons' private home.

The Wilsons were lying in bed that morning when they heard a commotion. Mr. Wilson, dressed only in his undershorts, got up to investigate and found a team of armed plainclothes officers, accompanied by the reporters, in his living room. The officers subdued Mr. Wilson, who was angry because of the intrusion. When Mrs. Wilson came out of the bedroom, wearing only a sheer nightgown, she saw a police officer holding a gun to her husband's head, pinning him face down on the floor in his undershorts. The news team observed and took photographs throughout these events.

The Wilsons filed suit against the Montgomery County police offi-

_____

[2] There was no equivalent Montgomery County Sheriff's Department ride-along policy. In fact, Raymond M. Kight, Sheriff of Montgomery County, believed that it would be a violation of the constitutional rights of a homeowner to bring a civilian on a ride-along program into a private home, unless the civilian were there as a witness to identify someone or served some other legitimate purpose related to the execution of the warrant.

[3] Even if photographs had been reasonably necessary to accomplish the purpose of the warrant, allowing a member of the news media to take the photographs was not; the police could have brought along a camera and snapped a picture themselves.

18

cers, the Deputy U.S. Marshals, their supervisor and others. They alleged that their Fourth Amendment rights were violated by the officers' inviting the reporter and photographer to accompany them into the Wilsons' home and to observe and photograph during the attempt to execute the arrest warrant. The defendants' assertion of qualified immunity was rejected by the district court, then brought to us on interlocutory appeal. A divided panel of this court reversed the district court, holding that the officers were entitled to qualified immunity. This rehearing en banc followed.

II.

A.

We must not, when arguing whether some specific incarnation of Fourth Amendment rights was or was not clearly established, lose sight of the core values that the Fourth Amendment was designed to protect. That amendment is "an American extension of the English tradition that a man's house [is] his castle." William Cuddihy & B. Carmon Hardy, A Man's House Was Not His Castle: Origins of the Fourth Amendment to the United States Constitution , 37 Wm. & Mary Q. 371, 400 (1980). "The belief that `a man's house is his castle' found expression at least as early as the sixteenth century" in English jurisprudence. Id. at 371.

In Semayne's Case, 77 Eng. Rep. 194 (K.B. 1604), the King's Bench resolved that "the house of every one is to him as his castle and fortress," id. at 195, and prohibited the government from forcibly entering a home at the behest of a private party, id. at 198. Although Semayne's Case accepted broad powers of search in cases where the government was a party, Lord Coke (who witnessed Semayne's Case as attorney general) later applied its adage that a man's house was his castle to curtail the arbitrary government invasion of private homes. See Cuddihy & Hardy, supra, at 376. William Pitt elaborated upon the sanctity of the home in his impassioned defense of private homeowners against discretionary government searches before Parliament in 1766. See id. at 386.

> The poorest man may, in his cottage, bid defiance to all the
> forces of the crown. It may be frail; its roof may shake; the

19

> wind may blow through it; the storm may enter; the rain may enter; but the king of England may not enter; all his force dares not cross the threshold of the ruined tenement.

Id. And William Blackstone, in his Commentaries wrote:

> And the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle, and will never suffer it to be violated with impunity . . . . For this reason no doors can in general be broken open to execute any civil process; though, in criminal cases, the public safety supersedes the private.

William Blackstone, 4 Commentaries on the Laws of England 223 (1769).

These principles are embodied in the Fourth Amendment of the United States Constitution: "The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ." As Justice Stewart wrote for the Supreme Court in Silverman v. United States, 365 U.S. 505 (1961):

> The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. Entick v. Carrington, 19 Howell's State Trials 1029, 1066; Boyd v. United States, 116 U.S. 616, 626-30 . . . . William Pitt's eloquent description of this right has been often quoted. The late Judge Jerome Frank made the point in more contemporary language: "A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty -- worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle." United States v. On Lee, 193 F.2d 306, 315-16 (dissenting opinion).

20

Id. at 511 & n.4. Today's majority opinion undermines the right at the very core of the Fourth Amendment and sanctions an"unreasonable governmental intrusion."

B.

"[G]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is critical to define the rights being examined at the appropriate level of specificity. See DiMeglio v. Haines, 45 F.3d 790, 803-04 (4th Cir. 1995). If the right is defined too broadly, it will always be found to have been clearly established. For example, it is clearly established that the deprivation of property without due process of law violates the Fourteenth Amendment. On the other hand, if the right is defined too narrowly, no proposition will ever be found to be clearly established. For example, probably no case will have held that the exact acts in question regarding the exact parties in contention under the exact circumstances presented is a constitutional violation.

For the right allegedly violated to be clearly established, it is not necessary that "the very act in question ha[ve] previously been held unlawful"; rather "in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). If the unlawfulness is apparent, the fact that some courts may have reached an incorrect result will not shield a defendant's violation of a clearly established right. See Jones v. Coonce , 7 F.3d 1359, 1362 (8th Cir. 1993) (finding that a right was clearly established despite an unpublished district court case that had not recognized the right).

C.

The government's right to intrude upon the privacy of the home is narrowly circumscribed by the Fourth Amendment's prohibition against unreasonable searches and seizures. The"physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. United States District Court, 407 U.S. 297, 313 (1972).

21

The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home -- a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

Payton v. New York, 445 U.S. 573, 589-90 (1980) (citation omitted) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)) (alterations in original). Similar language is omnipresent in the Supreme Court's Fourth Amendment jurisprudence. See, e.g., Winston v. Lee, 470 U.S. 753, 761-62 (1985) (explaining that "[i]ntruding into an individual's living room" to conduct a search "damage[s] the individual's sense of personal privacy and security and[is] thus subject to the Fourth Amendment's dictates").

Unless a search is supported by a warrant or a specific exception to the warrant clause, it is per se unreasonable, and therefore unconstitutional. See Coolidge v. New Hampshire, 403 U.S. 443, 489 (1971) ("[S]earches and seizures inside a man's house without warrant are per se unreasonable in the absence of some one of a number of well defined `exigent circumstances.'"). The arrest warrant in this case was addressed "to any duly authorized peace officer." It made no mention of a news team or of a photographer, or of any private individuals to be invited into another's private home. Nor is there any claim that exigent circumstances or some other exception to the warrant clause excused the Montgomery County Circuit Court's failure to allude to a reporter or photographer.

Even when a valid warrant authorizes entry into a private home, a police officer is limited to those actions explicitly named in the war-

22

rant. See Bivens, 403 U.S. at 394 n.7 ("[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant . . . ."); Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir. 1995). The reasonableness of a search or seizure depends in part on how it is carried out. See Graham v. Connor , 490 U.S. 386, 395 (1989).

A warrant may imply some limited authority to take actions not explicitly mentioned in it, but reasonably necessary to further its purposes. See Summers, 452 U.S. at 705 (holding that a search warrant for a home carries the implied authority to detain its occupants); Lawmaster v. Ward, 125 F.3d 1341, 1349 (10th Cir. 1997). For example, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, 445 U.S. at 603. This authority is implied because"[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." Id. at 602-03.

Because the media presence here served no legitimate law enforcement function, but rather was intended solely to gather news to profit the Washington Post, the arrest warrant did not carry with it the implied authorization to invite the media into a private house.**4** The reporter and photographer "were not involved in executing the warrant," but were "mere bystanders." Brief of Appellants at 8. The district court found that the reporters were "not serving any legitimate law enforcement purposes." (transcript of hearing on summary judgment motions). A warrant does not carry with it the authority to bring along mere bystanders to observe for their own commercial purposes.

Even if we only consider cases from the Supreme Court, the Fourth Circuit Court of Appeals, and the Court of Appeals of Maryland, the

_____

**4** An intrusion into a private home is entirely different from a situation where ride-along reporters accompany police officers or cameras are mounted on police cars on a public street. Those situations do not involve the reasonable expectation of privacy inherent in a home invasion.

23

principles recounted above were all clearly established by the time of the search in April 1992. In addition, by March of 1992, one circuit court had explained that officers searching a private residence pursuant to a warrant might unconstitutionally "exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises." Bills v. Aseltine, 958 F.2d 697, 704 (6th Cir. 1992). And it has been established in the common law since the early 1600's that "[e]ven a duly authorized officer could not execute a warrant to further the purposes of a private individual." Buonocore, 65 F.3d at 354 (citing Semayne's Case, 77 Eng. Rep. 194, 198 (K.B. 1604); Burdett v. Abbott, 104 Eng. Rep. 501, 560-61 (K.B. 1811)).

The Supreme Court jurisprudence, circuit court precedent and long-standing principles of common-law discussed above were not made any less clear by the fact that two unpublished district court opinions had concluded that inviting the news media to observe the execution of a search warrant within a private home did not violate any federally protected right. See Moncrief v. Hanton, 10 Media L. Rep. (BNA) 1620, 1621-22 (N.D. Ohio Jan. 6, 1984) (holding that plaintiffs had "alleged no facts to show a search was unreasonable," nor had they stated a claim for violation of any other federally protected right to privacy);**5** Higbee v. Times-Advocate, 5 Media L. Rep. (BNA) 2372, 2372-73 (S.D. Cal. Jan. 9, 1980) (rejecting a plaintiff's claim of deprivation of federally protected privacy rights without addressing the Fourth Amendment). We have previously observed that "[s]ince unpublished opinions are not even regarded as binding precedent in our circuit, such opinions cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity."**6** Hogan v.

_____

**5** Despite Moncrief's holding, the entry by the news media, without mention in the warrant, was plainly unreasonable in Fourth Amendment terms.

**6** It seems logical that repeated decisions refusing to recognize a right would be evidence that the right was not clearly established even if the opinions were unpublished. However, it is well known that judges may put considerably less effort into opinions that they do not intend to pub-

Carter, 85 F.3d 1113, 1118 (4th Cir.), cert. denied, 117 S. Ct. 408 (1996). More importantly, neither of the unpublished district court cases squarely addressed the claim made by the Wilsons, that police violate the Fourth Amendment when they invite reporters who are not mentioned in the warrant nor reasonably necessary to its execution to accompany them into a private home, without the consent of the homeowner. In Moncrief the court only addressed procedural challenges to the execution of the warrant (such as its timing) in rejecting the plaintiffs' Fourth Amendment claim. See Moncrief, 10 Med. L. Rep. at 1621. And the court in Higbee never considered the Fourth Amendment at all. See Higbee, 5 Med. L. Rep. at 2372-73. Neither case endorses or approves of the actions here complained of; they never discuss the issue at all. Such unpublished cases amount to no precedent whatsoever, and cannot render a defendant immune from liability for the violation of a clearly established law. See Jones, 7 F.3d at 1362 (finding that a right was clearly established, despite an unpublished district court case that had not recognized the right); compare Ayeni v. Mottola, 35 F.3d 680, 684-86 (2d Cir. 1994) (holding that it was clearly established in 1992 that officers violated the Fourth Amendment when they allowed a television crew to film the execution of a search warrant (which made no mention of their presence) at a private residence), cert. denied, 514 U.S. 1062 (1995), with Parker v. Boyer, 93 F.3d 445, 447 (8th Cir. 1995) (observing that no such right was clearly established because most cases that had addressed the question had found no constitutional violation, citing unpublished cases but ignoring broader principles of Fourth Amendment law), cert. denied, 117 S. Ct. 1081 (1997).

In addition to the unpublished cases, the majority notes that an intermediate appellate court in Wisconsin has faced a similar issue. That court in 1980 was "unwilling to accept the proposition that the filming and television broadcast of a reasonable search and seizure, without more, result in unreasonableness," where "neither the search

_____

lish. Because these opinions will not be binding precedent in any court, a judge may be less careful about his legal analysis, especially when dealing with a novel issue of law. For this reason we are loathe to cite to unpublished opinions, see Local Rule 36(c), nor will we consider them to be evidence that a right is or is not clearly established.

25

. . . nor the film or its broadcast has been shown to include intimate, offensive or vulgar aspects." Prahl v. Brosamle, 295 N.W.2d 768, 774 (Wis. Ct. App. 1980). Unlike that case, here the search and photography clearly involved intimate aspects -- Mr. Wilson was held at gunpoint in his underwear and Mrs. Wilson was photographed in only a sheer nightgown. Thus Prahl offers no solace to these defendants.**7**

It was manifest to any reasonable officer in 1992 (indeed before that date) that he had to strive to minimize the substantial intrusion upon privacy that accompanies the execution of a warrant in a private home. The Supreme Court has warned that "responsible officials, including judicial officials, must take care to assure that [searches and seizures that may reveal innocuous, private information] are conducted in a manner that minimizes unwarranted intrusions upon privacy." Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976). Here the police officers maximized the intrusion upon the privacy of the parents' home during a search for their son, by holding the innocent occupants of the home at gunpoint while members of the media photographed them in their underwear. The officers could hardly have done more violence to the well-established Fourth Amendment principles recounted above.

D.

The majority does not disagree with the conclusion that

in 1992 it was clearly established that the Fourth Amend-

_____

**7** Even had Prahl been directly supportive of the officers' actions, its erroneous conclusion could not immunize them from liability for violation of clearly established law. Although we have in the past held that a single state court of appeals case to the contrary"alone suffice[d] to show that [a recently recognized right] had not theretofore been clearly established." Swanson v. Powers, 937 F.2d 965, 969 (4th Cir. 1991), in that case the newly recognized tax holding did not have the clear constitutional pedigree of the right the Wilsons assert, see id. at 968 (holding that the right not to be discriminatorily taxed was not clearly established because "[t]he most pertinent judicial decisions had upheld comparable taxing schemes and the doctrine of intergovernmental tax immunity was, at best, ambiguous").

26

ment was violated if officers permitted third parties who were not expressly authorized by the warrant and who were not assisting reasonable law enforcement efforts related to the execution of the warrant to accompany them into a residence . . . .

Majority opinion at p. 9. The majority nevertheless has asserted that because there was "no clear law . . . establishing that permitting reporters to observe and photograph the events surrounding the execution of an arrest warrant <u>may not</u> serve a legitimate law enforcement purpose related to execution of the warrant," a reasonable law enforcement officer might have concluded that permitting the reporters in this case to observe and photograph <u>did</u> serve such a purpose. <u>Id.</u> at 9 (emphasis added).

The majority's argument is speculative and disingenuous at best; it may just as well have argued that, because there was no law prohibiting reporters or photographers from being authorized by the warrant, a reasonable officer might have concluded that the reporters and photographer in this case <u>were</u> authorized by the warrant. But of course, the officers knew that they were not so authorized; the warrant made no mention of reporters or photographers. Likewise, the officers knew full well that the reporters served no legitimate law enforcement purpose, and no reasonable officer on that team could have thought otherwise. The officers recognized as much when they explained in their brief that the reporters "were not involved in executing the warrant" but were "mere bystanders." Brief of Appellants at 8. The panel opinion, in finding there was qualified immunity, stated that: "[t]he reporters' participation was part of a two-week, news-gathering investigation by the newspaper; it was <u>not designed</u> to serve any legitimate law enforcement purpose." 110 F.3d 1071, 1072 (4th Cir. 1997) (emphasis added).**8**

The news gathering team was part of a two week investigation to produce a story or stories about law enforcement. The police brought the team along in the hope of getting some good press; that is all. The majority's suggestion that the police officers might have concluded

_____

**8** Interestingly, the <u>en banc</u> majority opinion leaves out the second half of that sentence. <u>See</u> majority opinion at 4.

that the reporters would "afford[ ] protection to the officers by reducing the possibility that the target of a warrant will resist arrest in the face of recorded evidence of his actions," majority opinion at 9, is absurd.**9** The team was not brought along for this reason, and no reasonable member of the team could have believed that it was.**10** There is no evidence that the team served this or any other legitimate law enforcement purpose.

Police officers cannot justify exceeding the clear bounds of a warrant by asserting that their actions might fortuitously have served some legitimate purpose despite being designed with no such purpose in mind. The reporters might also have helped by carrying the warrant while the officers handcuffed suspects, or by holding the door open for an officer while he was carrying contraband; but to uphold the police actions because of the potential for fortuitous assistance, despite clearly not being designed to serve law enforcement, would make a mockery of the rule that an officer's actions are limited to the scope authorized by the warrant. See Bivens, 403 U.S. at 394 n.7.**11**

_____

**9** Although I have cited to the passage on page 9 as the "majority opinion," it is important to note that only five of the eleven active Circuit Judges have joined this portion of the en banc opinion. A majority of the en banc court (the five dissenting Judges and Judge Widener) does not endorse the hypothetical reasons referred to as legitimate justifications for the officers' actions. Nor is the conclusion, see majority op. at 9 ("In any event, we conclude that reasonable law enforcement officers could have believed that permitting the reporters to observe and photograph the execution of the arrest warrant advanced a legitimate law enforcement purpose related to the execution of the warrant."), the law of our Circuit; on that point, the Circuit is evenly divided.

**10** This attention to the belief that the actual officers may have possessed at the time of the search "does not reintroduce into qualified immunity analysis the inquiry into officials' subjective intent." Anderson, 483 U.S. at 641. Rather, the Supreme Court has explained that the determination of whether it was objectively reasonable for an officer to have believed that his search was lawful "will often require examination of the information possessed by the searching officials." Id. Our inquiry must ask whether a reasonable officer, knowing what these officers knew about the news team, could have concluded that their presence was reasonably necessary to serve the purpose of the arrest warrant.

**11** Similarly, early English jurisprudence recognized that a warrant issued to officers in one jurisdiction cannot properly be executed by officers of another jurisdiction. See Freegard v. Barnes and Barton, 155 Eng. Rep. 1185, 1186 (Exch. 1852).

28

The exceptions to this strict limitation permit only those actions reasonably necessary to accomplish the purpose of the warrant. See Payton, 445 U.S. at 602-03; Summers, 452 U.S. at 705.

It is fundamental that, when practicable, officers must obtain the approval of a neutral judicial officer, via a warrant, for any intrusion upon the Fourth Amendment privacy of an individual's home. See Johnson v. United States, 333 U.S. 10, 13-14 (1948). If the presence of a photographer or other observer on a search in a private home would be reasonably necessary to serve a legitimate purpose, then a police officer in obtaining the warrant should explain so to the judicial officer issuing the warrant. See, e.g., Stack v. Killian, 96 F.3d 159, 163 (6th Cir. 1996) (holding that police officers were justified in bringing a television crew into a house to videotape the execution of a search warrant because "the warrant at issue[specifically] authorized `videotaping and photographing' during the execution of the search."). Despite these settled principles, the majority's holding today allows police unilaterally to invite a reporter or anyone else to accompany them whenever entering a house, even if the warrant says absolutely nothing about allowing other parties to enter, so long as their presence might fortuitously produce some benefit to the police.**12**

E.

A proper understanding of the relationship between this case and our precedent in Buonocore v. Harris, 65 F.3d 347 (4th Cir. 1995), further reveals that the officers' actions violated clearly established law. In Buonocore, officers executing a search warrant for illegal

_____

**12** The majority's holding will also undermine the rule recognized in Buonocore, 65 F.3d 347, discussed below, that"the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant," id. at 356. That private individual's presence, after all, might "afford[ ] protection to the officers by reducing the possibility that the target of a warrant will resist arrest in the face of" a witness to his actions. Majority opinion at 9. By the majority's reasoning, such potential fortuitous assistance might be enough to shield an officer from liability for a clear constitutional violation.

29

weapons at the plaintiff's residence invited a security officer from the plaintiff's work to attend the search and look for items possibly stolen from work (which were not mentioned in the warrant). See id. at 350. The plaintiff filed a Bivens action alleging that the officers' actions violated the Fourth Amendment, and the officers raised a qualified immunity defense. See id. at 351-52.

The Fourth Circuit in Buonocore discussed two related concepts contained within the Fourth Amendment:

> First, by mandating that "no warrants shall issue" unless they "particularly" describe "the place to be searched" and "things to be seized," the Framers prohibited the use of general warrants issuable to anyone. Second, by expressly acknowledging the substantive "right of the people to be secure in their . . . houses," the Framers recognized a person's special right to privacy, to be left undisturbed -- except for reasonable searches -- within his own home.

Id. at 353. After a thorough and detailed analysis, the court concluded that the officers' actions offended both aspects of the Fourth Amendment:

> In view of the "common law at the time of the framing," of the Fourth Amendment, and the Supreme Court's uniform interpretation of the Amendment's protections since that time, we have no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not "reasonable." It obviously exceeds the scope of the required specific warrant and furthermore violates the "sanctity of private dwellings."

Id. at 356 (citations omitted).

The Buonocore panel next asked whether these rights were clearly established at the time of the search (in November of 1992). Instead of analyzing the two elements separately, however, it combined them,

30

holding that "[t]he right to be free from government officials facilitating a private person's general search of the sort Buonocore alleges was conducted here, is `manifestly included' within `core' Fourth Amendment protection." Id. at 357.**13** On that basis the en banc majority attempts to read narrowly and distinguish Buonocore from the situation in Wilson.

Today's majority recognizes that Buonocore holds that "it was clearly established on November 24, 1992 that `Fourth Amendment law prohibited government agents from bringing a private citizen into Buonocore's home to conduct an independent, general search for items not identified in any warrant.'" Majority opinion at 10 n.6 (quoting Buonocore, 65 F.3d at 353). Of course, the reporter and photographer brought into the Wilson home were private citizens. But the majority argues that these reporters did not conduct a "general independent search," id., nor was their taking of photographs a seizure, id. at 8-9. Neither assertion is persuasive; in fact, the rights asserted by the Wilsons are analogous to those asserted by Buonocore.

First, it is clear that the reporter's and photographer's actions constituted an independent search. The district court found that

> to the extent that [the reporters] weren't[trying to aid law enforcement], they were in the house, snooping around, looking around, participating in one fashion or another with both the search of the premises for the individual, who was not found, and the seizure of the Wilsons, who were detained and actually photographed by the photographer.

(transcript of hearing on summary judgment motions).

An inspection amounts to a "search" if it intrudes upon a subjective expectation of privacy that society is prepared to recognize as reasonable. See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J.,

_____

**13** It was not necessary at the time to discuss whether the right to be free from the police inviting third parties, who were not mentioned in the warrant and not reasonably necessary to its execution, into a private home during execution of a warrant, independent of their searching, was clearly established.

31

concurring). The Wilsons unquestionably had a reasonable expectation of privacy in their home and in their undressed bodies vis-a-vis the reporters. The reporter's and photographer's "snooping around" and "looking around" the inside of the Wilsons' home violated that reasonable expectation of privacy. The violation was magnified exponentially by the reporter's intention to publish the story he observed to the world at large, and the photographer's taking photographs of the Wilsons' humiliating circumstances, particularly Mr. Wilson wearing only his underwear, being held prostrate on the floor with a gun to his head.**14**

Perhaps the majority believes that the Wilson search did not implicate the right recognized in Buonocore because "the reporters did not conduct a search of, or intrude into, any areas of the Wilsons' home into which the officers would not have been permitted to go in executing the arrest warrant." Majority opinion at 8. Any attempt to distinguish the Buonocore search on the grounds that the Wilson search was not "an independent" one, however, is unavailing.**15**

_____

**14** It is immaterial that the photographs have not yet been published, except to the extent that publishing them should increase the allowable damages. They have in any event been seen by him who took them and by an editor or editors of the Washington Post .

**15** It is possible that the majority means to suggest that, because the officers had already seen everything that the reporters saw, the Wilsons had no remaining expectation of privacy in their home or undressed persons to be infringed by the reporters' observation. See Brief of Appellant at 16-17 (citing United States v. Jacobsen, 466 U.S. 109, 115 (1984)). Such a mechanical understanding of a reasonable expectation of privacy may be appropriate in regard to a search that reveals only information -- for example, once an individual gives information to a third party, he assumes the risk that the third party will reveal the information to the authorities. See United States v. Miller, 425 U.S. 435, 442-43 (1976). An expectation of privacy in the shared information is not reasonable, and does not implicate the Fourth Amendment. See id.  at 443.

But the same cannot be said for a search that intrudes on a privacy right founded as much in dignity as in secrecy. If the Wilsons had invited a guest into their home, the guest could not then have opened the door to the police to conduct a search. Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990). One retains a reasonable expectation of privacy in one's

The news team's search of the Wilson home was independent of the police execution of the arrest warrant in that the two parties were looking for altogether different things: the police were looking for a fugitive whereas the news team was looking for anything dramatic that might make a good story. The language in Buonocore stressing the independence of the officers' and private party's searches, 65 F.3d at 358-59, served only to explain why 18 U.S.C.A.§ 3105 (West 1985) did not offer a defense to the officers. Section 3105 provides that a search warrant may be served by a person not mentioned in the warrant only if the third party acts "in aid of the officer on his requiring it, he being present and acting in its execution." 18 U.S.C.A. § 3105 (West 1985). Daniel Buonocore's Fourth Amendment rights would still have been violated if the private party who searched his house at the invitation of the police officers had followed them around the house, going only where the officers went, as long as the private party was acting independently of the officers, that is, not in their aid.

Nor is the majority correct to assert that the photographing of the Wilsons, undressed, was not a "seizure" because it did not "meaningful[ly] interfer[e] with" their "possessory interests in . . . property." Majority opinion at 8 (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)) (internal quotation marks omitted). We have in the past recognized that "taking a photograph may, under some circumstances, constitute an unreasonable seizure." United States v. Espinoza, 641 F.2d 153, 166-67 (4th Cir. 1981) (finding that where an officer has a right to be in a given location, he may take photographs of what he sees in plain view, thereby "`seizing' those views themselves as evidence."). The reporters, however, had no right to be within the Wilsons' home, and the Wilsons unquestionably had a possessory interest in their undressed likenesses. Had their photographs been published, they might have sued the Washington Post for invasion of privacy. See Lawrence v. A.S. Abell Company, 475 A.2D 448,

_____

home, vis-a-vis the government, even if one has previously allowed someone else to enter. Similarly, the Wilsons retained a reasonable expectation of privacy in their home, vis-a-vis the reporters, even though the police had the right to enter pursuant to the warrant. The reporters clearly had no such right.

33

453 (Md. 1984) (recognizing that a newspaper can be sued for appropriation of another's likeness, but not if the picture is news, taken while in a public place at a newsworthy event). The photographer did not have the Wilsons' permission to photograph, nor was the Wilsons' home a public place. The property interest was clearly established well before the search in 1992.

The majority concludes its discussion of the reporters' actions by asserting that

> reasonable officers under these circumstances had no clearly established law from the Supreme Court, this court, or the Court of Appeals of Maryland from which they necessarily understood that they exceeded the scope of an arrest warrant by permitting reporters to engage in activities in which they themselves could have engaged consistent with the warrant.

Majority opinion at 8-9. One need only follow that assertion to its logical conclusion to see that it reduces to an absurdity. It implies that if a police officer had a warrant addressed to him by which he could invade someone's privacy, he could reasonably have believed that it was permissible to allow any other party to do whatever was authorized by the warrant. If, for example, the police officers had a warrant to perform a body cavity search upon Mrs. Wilson, the majority implies that they could have believed the warrant authorized them to allow members of the public to watch and then to perform the body cavity search themselves. Furthermore, assuming that a photograph is not a seizure, a police officer conducting a strip search pursuant to a warrant could believe the warrant authorized him to invite newspaper photographers to photograph Mrs. Wilson being stripped.

Of course this is ridiculous. Such a search would be patently unreasonable. But it would be one in which the reporter had seen no more than the officer was entitled to see, and in which the photographer, for his own private benefit, took pictures no more intrusive than the police could have taken if they had had a legitimate reason to do so. In today's case the majority finds that it was not clearly unreasonable for a police officer to force at gunpoint a citizen in his underwear to pose for a camera, potentially to be exhibited to the entire viewing

34

readership of the Washington Post. This, too, was patently unreasonable.

In sum, the reporters' observations and photography constituted an additional private search and seizure not described in the warrant nor carrying out its purposes. The officers' inviting the reporters into the home to conduct their search for news while the officers executed the arrest warrant thus falls squarely under Buonocore, and was clearly prohibited by the Fourth Amendment in 1992.

> To conclude otherwise would authorize law enforcement officers to invite private individuals to engage in conduct that would constitute trespass were it not conducted under the guise of a search warrant. Neither the Fourth Amendment nor § 3105 grants government agents such authority.

Buonocore, 65 F.3d at 359.

III.

Although the exact issue of police inviting news media to observe and record the execution of an arrest warrant within a home has never been discussed by the Supreme Court or the Fourth Circuit, three other circuits have asked whether officers deserved qualified immunity under facts substantially similar to the Wilson case.[16] The Second Circuit in Ayeni v. Mottola, 35 F.3d 680 (2d Cir. 1994), cert. denied, 514 U.S. 1062 (1995), held that "an objectively reasonable officer [on March 5, 1992] could not have concluded that inviting a television crew -- or any third party not providing assistance to law enforcement -- to participate in a search was in accordance with Fourth Amendment requirements," id. at 686. That Circuit's analysis is worth quoting at length:

_____

[16] The majority misunderstands my description of the reasoning of other circuits in similar cases. See majority op. at 12-13. Of course I do not "rel[y]" on the "decisions" of these circuits to support the proposition that the law was clearly established at the time of the execution of the warrant in the Wilson home, for the simple reason that these decisions were announced after the execution of the warrant. However, the reasoning used by these circuits is instructive.

35

[The officer] correctly asserts that there is no reported decision that expressly forbids searching agents from bringing members of the press into a home to observe and report on their activities. He therefore argues that there was no clearly established rule prohibiting such an act. The argument lacks merit. It has long been established that the objectives of the Fourth Amendment are to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties and that, in the normal situations where warrants are required, law enforcement officers' invasion of the privacy of a home must be grounded on either the express terms of a warrant or the implied authority to take reasonable law enforcement actions related to the execution of the warrant.[The officer] exceeded well-established principles when he brought into the [private] home persons who were neither authorized by the warrant to be there nor serving any legitimate law enforcement purpose by being there. A private home is not a soundstage for law enforcement theatricals.

The unreasonableness of [the officer's] conduct in Fourth Amendment terms is heightened by the fact that, not only was it wholly lacking in justification based on the legitimate needs of law enforcement, but it was calculated to inflict injury on the very value that the Fourth Amendment seeks to protect -- the right of privacy. The purpose of bringing the . . . camera crew into the [private party's] home was to permit public broadcast of their private premises and thus to magnify needlessly the impairment of their right of privacy.

Id.

We should wholeheartedly agree with the foregoing discussion. See also Hagler v. Philadelphia Newspapers, Inc., 1996 WL 408605, *2 - *3, 24 Media L. Rep. 2332 (E.D. Pa. July 12, 1996) (adopting and quoting the reasoning of Ayeni); but see Bills v. Aseltine, 52 F.3d 596, 602 (6th Cir. 1995) (criticizing Ayeni for its "failure to define narrowly the right allegedly violated, instead describing the violation in abstract and general terms").

36

The most recent circuit court decision to address the question, Berger v. Hanlon, 129 F.3d 505 (9th Cir. 1997), holds that it was clearly established in 1993 that police officers violate the Fourth Amendment when, in executing a search warrant on private premises, they planned and assisted in the television broadcasting of that search despite no mention in the warrant of any media presence, see id. at 510-12.

> The Bergers contend that the resulting search violated their Fourth Amendment rights against unreasonable searches and seizures. We hold they are correct and that the federal officers are not entitled to qualified immunity.
>
> This was no ordinary search. It was jointly planned by law enforcement officials and the media, as memorialized by a written contract, so that the officials could assist in the media obtaining material for their commercial programming. The television cameras invaded the residential property of the plaintiffs and the microphone invaded their home. This search stands out as one that at all times was intended to serve a major purpose other than law enforcement. Yet, the federal agents obtained the warrant without disclosing the contract, the planned press presence, or the media's purpose. The Fourth Amendment to our Constitution protects against unreasonable searches and warrants that are obtained under false pretenses . . . . We must heed its strictures on the potential abuse of law enforcement powers. This search violated its protections.

Id. at 510-11.

The Ninth Circuit stressed that the extent of the law enforcement officials' involvement in planning, cooperating with and assisting the media presence was unprecedented, surpassing the more passive role played by police in cases such as Wilson v. Layne. See id. at 511-12 (distinguishing the panel opinion in Wilson v. Layne, 110 F.3d 1071 (4th Cir. 1997)). However, the execution of the arrest warrant at the Wilsons' home, just like the search of the Bergers' ranch, "at all times was intended to serve a major purpose other than law enforcement." Id. at 510. Both searches were also intended to serve the private inter-

37

ests of the media. These invasions, no less than the search of the Ayeni's home, turned private property into a stage for "law enforcement theatricals." Ayeni, 35 F.3d at 686.

Relying on Ayeni and Buonocore, the Ninth Circuit found that the officers who orchestrated the media invasion of the Bergers' Fourth Amendment rights were unprotected by qualified immunity. Berger, 129 F.3d at 511. The Circuit found "even further support for this view when [it] observe[d] that no circuit court decision ha[d] ever upheld the constitutionality of a warranted search where broadcast media were present to document the incident for non-law enforcement purposes, and where the videotaping and sound recording were outside of the scope of the warrant." Id. The circuit recognized that the Fourth Amendment establishes a presumption that such invasions are prohibited unless justified by a warrant or by some exception to the warrant clause. In Berger, just as in Wilson, the warrant made no mention of media presence, the presence of members of the media was not reasonably necessary to assist in execution of the warrant, and no exigency presented itself that prevented the police from seeking to provide for media presence in the warrant. Because the broadcast of the search was not intended to serve law enforcement purposes but rather was undertaken, as in the case of the Wilsons, for commercial entertainment, the Ninth Circuit held that the officers did not enjoy immunity. See id. at 512.

The Eighth Circuit held in Parker v. Boyer, 93 F.3d 445 (8th Cir. 1996), cert. denied, 117 S. Ct. 1081 (1997), that it was not "self-evident[17] that the police offend general Fourth Amendment principles when they allow members of the news media to enter someone's house during the execution of a search warrant," and that therefore this did not violate any clearly established right as of 1994, id. at 447. The Eighth Circuit observed that "most courts have rejected the argument that the United States Constitution forbids the media to encroach on a person's property while the police search it," dismissing Ayeni and **Buonocore[18]** as "indicat[ing] at most only the beginnings of a trend in

the law." Id.

_____

[17] Whether something is "self-evident" depends on who is doing the looking.

[18] And would presumably dismiss Berger as well.

38

Conspicuously absent from the Parker opinion is any discussion of the constitutional principle limiting an officer executing a warrant to those actions expressly authorized by the warrant or reasonably necessary to effect its legitimate law enforcement purpose. Indeed, the Eighth Circuit completely disregarded the Supreme Court's directive in Anderson v. Creighton, 483 U.S. 635 (1987), that it must look not only for a case on point holding that the officers' actions were prohibited, but also to related and analogous law to discover whether the unlawfulness of the officers' actions was apparent, id. at 640; see also Recent Case, 110 Harv. L. Rev. 1340, 1342-44 (1997) (The Eighth Circuit "improperly ended its inquiry after ascertaining that no case had explicitly identified such a right at the time the officers conducted their search. Instead, the court should have considered whether an existing precedent falling along the spectrum between general Fourth Amendment principles and a previous case on point clearly established a constitutional right to be free from media intrusion at the execution of a search."). Had the Eighth Circuit conducted the broader inquiry that Anderson requires, it would have considered the well-established principles recounted above, which are so central to the analysis. Perhaps, then, it would have come to a wiser result. See id. at 1345 ("Had the Eighth Circuit followed Anderson's guidance, it might have reached a different result. Instead, it too hastily legitimated the practice of tag-along journalism. . . . Faced with an issue of increasing constitutional urgency, the court should have undertaken the more careful, nuanced analysis that Anderson invites.").

The majority's en banc opinion adds our Circuit's voice to the split between the Second and Ninth Circuits on the one hand and the Eighth Circuit on the other. Given the prevalence of real-life police dramas on television, other circuits will face this question soon enough. They will, I hope, reach a more just conclusion than have we.

IV.

Perhaps the reason for the disagreement between the majority and myself, about whether the reporters' presence was reasonably necessary to accomplish a legitimate law enforcement purpose, results from a disagreement about what that question means. I believe that the role which the reporters played at the Wilson home is a question of historical fact, which can be discovered by questioning the witnesses. In this

39

case, the police officers have admitted both at the district court level and here on appeal that the reporters were merely bystanders and played no role in the execution of the arrest warrant itself.

The majority, on the other hand, does not treat the role of the news reporters as a question of historical fact, but rather as one of law which itself must be clearly established. The majority asked whether it was clearly established to a reasonable police officer that the reporters could not serve a legitimate law enforcement purpose. Such an approach will exonerate even the most culpable officers.

We know that the actual purpose for which the police officers brought along the reporters was not reasonably necessary to the execution of the warrant. We need not ask whether it was clearly established that some other purpose, which the police officers never actually thought about, could not have reasonably been thought necessary to the execution of the warrant. But I note, for completeness, that I do not believe that the hypothetical reasons described in the majority opinion (e.g., "affording protection to the officers" or "facilitating accurate reporting," majority op. at 9) are sufficiently necessary to the execution of an arrest warrant to justify the undermining of the sanctity of the home and the fundamental principle behind the Fourth Amendment that a man's home is his castle.

The majority goes much too far when it sanctions unconsented-to public tours of private homes, with photography allowed, under the guise of an arrest warrant. After today, any police officer entering a private home under a search or an arrest warrant may bring along any observer as a bystander, even an observer there only to serve his own commercial purposes or to satisfy mere curiosity. Regardless of the officers' actual reasons for bringing the third party along, this Circuit will immunize the officer because the third party's presence might have reduced the possibility that the target of the warrant would resist arrest, or because "public oversight of law-enforcement activities . . . deters crime, as well as improper conduct by law enforcement officers," id. Far from protecting us against tyrannical police practices, the majority's opinion today threatens one of the most sacred rights protected by the United States Constitution. From now on in the Fourth Circuit, unlike the Second or Ninth, if ever the government

40

need enter a private home, the home -- and its occupants -- can be laid bare for all the world to see.

The Fourth Amendment guarantees that the sanctity of the home, one's castle, will not be disturbed unless by warrant or pursuant to a specific warrant exception. These reporters were not mentioned in the warrant. Their presence was not justified by any exception to the warrant clause, nor was it reasonably necessary to accomplish the purposes of the warrant. These reporters were in the Wilsons' home strictly for their own commercial news-gathering purposes. When police orchestrate the entry of third parties, including newspaper reporters, into a private home without the consent of the homeowner, without the authorization of a warrant, for no legitimate law enforcement need and justified by no exigent circumstances, they violate the clearly established protections of the Fourth Amendment.

From the majority opinion, I dissent. Judges Ervin, Hamilton, Michael, and Motz join in this dissenting opinion.

41